**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

EMPOWER OVERSIGHT WHISTLEBLOWERS & RESEARCH,

Plaintiff,

v.

NATIONAL INSTITUTES OF HEALTH,

Defendant.

Case No. 1:21-cv-1275 (LMB/JFA)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

JESSICA D. ABER
UNITED STATES ATTORNEY

MEGHAN LOFTUS
Assistant United States Attorney
Office of the United States Attorney

*Counsel for Defendant*

## INTRODUCTION

Plaintiff Empower Oversight Whistleblowers & Research challenges National Institutes of Health's ("NIH") responses to two of its Freedom of Information Act ("FOIA") requests. NIH has released, in whole or part, close to 2,000 pages of records responsive to these two requests. Nonetheless, Plaintiff maintains that NIH failed to adequately conduct its searches and over-applied statutory exemptions.

Summary judgment should be granted for NIH because it conducted searches reasonably calculated to lead to responsive records. NIH looked for records related to Plaintiff's request in databases where responsive materials are kept in the normal course of business, as well as the emails of NIH employees likely involved in discussions about Plaintiff's requested topics. Furthermore, NIH appropriately withheld materials pursuant to statutory exemptions, 5 U.S.C. § 552(b)(5) and (b)(6). NIH withheld material on the basis of the deliberative process privilege because the material was internal, pre-decisional conversations among NIH employees in which they debated how to respond to inquiries from the public, Congress, and the media, or debates about future agency action. NIH also withheld certain identifying information of NIH employees and others, under the personal privacy exemption, as none of that information would shed any light on how NIH performs its statutory duties. NIH has fulfilled its obligations under FOIA, and this Court should grant summary judgment in its favor.

## STATUTORY AND REGULATORY BACKGROUND

"Congress enacted FOIA, 5 U.S.C. § 552, to permit a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the functioning of a democratic society." *Wickwire Gavin, P.C. v. U.S. Postal Serv.*, 356 F.3d 588, 591 (4th Cir. 2004). "In enacting the statute, Congress also recognized that legitimate governmental and private interests could be harmed by release of certain types of information." *Id.* Thus, a federal agency must

generally make its internal records available to the public upon a request, subject to certain enumerated categories of records that are statutorily exempt from disclosure. *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 290 (4th Cir. 2004); *see also* 5 U.S.C. § 552(b). "These exemptions are designed to safeguard various public interests against the harms that would arise from overbroad disclosure." *Hanson*, 372 F.3d at 290.

An individual seeking the release of records pursuant to FOIA must follow the relevant agency's published regulations for making such a request. *See* 5 U.S.C. § 552(a)(3)(A). To request records from NIH, a component of the Department of Health and Human Services ("HHS"), a request must be made in writing to the NIH FOIA officer. 45 C.F.R. § 5.22(a). Per statute, NIH has 20 business days "to determine . . . whether to comply with such request," 5 U.S.C. § 552(a)(6)(A), although HHS regulations state that the agency will acknowledge all FOIA requests in writing within 10 working days, 45 C.F.R. § 5.24(a). NIH must provide its release determination to the requestor in writing, "including whether any responsive records were located, how much responsive material was located, whether the records are being released in full or withheld in full or in part," fees, and the requestor's right to seek assistance from the relevant FOIA Public Liaison. *Id.* § 5.28(a).

## STATEMENT OF UNDISPUTED FACTS

### I. Background on NIH's FOIA Process

1. NIH is the nation's medical research agency, seeking to make discoveries that improve health and save lives. It consists of 27 different components, each with its own research agenda. Garcia-Malene Decl. (Mar. 30, 2022) ¶ 5 (DEX 1).

2. NIH's FOIA program is decentralized. Each institute or center has a FOIA staff dedicated to responding to requests. Requesters can send requests to the relevant institute or center of interest or to NIH's Office of the Director ("OD"). Garcia-Malene Decl. ¶ 6.

3. When a request requires a partial or full denial under a FOIA exemption, or relates to COVID, the request is transferred to the FOIA staff in the OD. Garcia-Malene Decl. ¶ 8.

4. The FOIA staff in the OD conducts a page-by-page, word-by-word review of all potentially responsive records to determine whether the record is responsive to the request, whether the information is publicly available, whether one of the statutory exemptions to FOIA applies, and whether the record contains the equities of other federal agencies or third-party stakeholders. During the review process, FOIA staff will consult with HHS program offices, federal agencies, or any other stakeholders of the records involved, as appropriate. Garcia-Malene Decl. ¶ 7.

5. Once records are finalized, a response letter is prepared detailing the number of pages processed, the number of pages withheld in part or in full, the number of pages sent for referral, and the reasons for any withholdings. Garcia-Malene Decl. ¶ 9.

**II. Sequence Read Archive ("SRA")**

6. The Sequence Read Archive ("SRA") is the largest publicly-available repository of high throughput sequencing data. *SRA*, NAT'L LIB. OF MED., NAT'L CTR. FOR BIOTECH. INFO., *available at* https://www.ncbi.nlm.nih.gov/sra (last accessed June 8, 2022) ("SRA website"). It is hosted by the National Center for Biotechnology Information ("NCBI") at the National Library of Medicine ("NLM"). Garcia-Malene Decl. ¶ 15.

7. In short, SRA is a data repository. "SRA accepts data from all branches of life as well as metagenomic and environmental surveys." SRA website. "SRA stores raw sequencing data and alignment information to enhance reproducibility and facilitate new discoveries through data analysis." *Id.*

8. On June 22, 2021, Jesse Bloom, Ph.D., of the Fred Hutchinson Cancer Research Center, published a manuscript on bioRxiv.[1] In that manuscript, known as a "preprint," Dr. Bloom stated that he had identified a data set containing COVID-19 sequences "from early in the Wuhan epidemic that has been deleted from the NIH'S Sequence Read Archive." Jesse Bloom, BIORXIV, *Recovery of Deleted Deep Sequencing Data Sheds More Light On The Early Wuhan SARS-CoV-2 Epidemic* (June 22, 2021), https://www.biorxiv.org/content/10.1101/2021.06.18.449051v1.full. Dr. Bloom recovered the data from Google Cloud. *Id.* Dr. Bloom later published the preprint in an academic journal. Jesse D. Bloom, *Recovery of Deleted Deep Sequencing Data Sheds More Light on the Early Wuhan SARS-CoV-2 Epidemic*, 38 MOLECULAR BIOLOGY & EVOLUTION 5211 (Dec. 2021).

## III. Plaintiff's FOIA Requests

### A. Plaintiff's FOIA Request 56712

#### 1. Searches

9. On July 15, 2021, NIH received a FOIA request via email, dated July 14, 2021, from Plaintiff. Plaintiff's request sought the following NIH records:

> 1) All communications regarding the request to post the SARS-CoV-2 sequences to the Sequence Read Archive in March 2020. This request covers all communications between March 1, 2020 to March 31, 2020.
>
> 2) All communications regarding the request to withdraw the SARS-CoV-2 sequences from Sequence Read Archive in June 2020. This request covers all communications between June 1, 2020 to June 31, 2020.
>
> 3) All communications regarding these withdrawn sequences as reported by a preprint titled "Recovery of deleted deep sequencing data sheds more light on the early Wuhan SARSCoV-2 epidemic" by Jesse Bloom, a virologist at the Fred Hutchinson Cancer Research Center. This request covers all communications between Jesse Bloom and the NIH, from January 1,

[1] According to its website, "bioRxiv (pronounced "bio-archive") is a free online archive and distribution service for unpublished preprints in the life sciences. . . . By posting preprints on bioRxiv, authors are able to make their findings immediately available to the scientific community and receive feedback on draft manuscripts before they are submitted to journals." *About*, BIORXIV, available at https://www.biorxiv.org/about-biorxiv (last accessed June 9, 2022).

> 2021 and the present. This request covers all communications inside the NIH regarding the preprint from June 21, 2021 to the present.
>
> 4) All communications to, from, and within the NIH press office about the NIH statement released on June 23, 2021, and about reports that these sequences were removed from the Sequence Read Archive. This includes all emails related to the drafting of the statement, communications about the reported removal, and communications with reporters. This request covers all communications between June 21, 2021 to June 25, 2021.

Garcia-Malene Decl. ¶ 10.

10. NIH assigned Plaintiff's FOIA request the internal control number 56712 on July 15, 2021. Garcia-Malene Decl. ¶ 12.

11. NCBI normally uses a database for tracking communications between curators and submitters to NCBI databases, including SRA. In response to Items 1 and 2 of Plaintiff's FOIA Request 56712, NCBI searched that database for communications between SRA curators and the submitter of the withdrawn SARS-CoV2 sequences. That database was selected as a location search because it houses the type of records Plaintiff sought, that is, anything related to SRA, its curators, and submitted sequences. The researcher who submitted, and then later withdrew, these sequences did so under the project identification "PRJNA612766." As a result, the NCBI team used that project identification as a search term to pull responsive documents from the database for the dates requested. Garcia-Malene Decl. (June 10, 2022) ¶ 16 (DEX 2).

12. In response to Item 3, NIH asked Stephen Sherry, Acting Director of NCBI, to search his Outlook account for responsive emails. As acting Director of NCBI, Dr. Sherry would have been involved in all communications sought by Plaintiff, *i.e.*, communications related to sequences, namely, withdrawn sequences, sequencing data related to COVID-19, and Jesse Bloom. Garcia-Malene Suppl. Decl. ¶ 17.

13. To conduct his search, Dr. Sherry used the following keywords: "preprint," "jesse bloom" and "biorxiv" for the dates requested—the type of publication, author, and publisher, respectively, for the preprint referenced in Item 3. Garcia-Malene Suppl. Decl. ¶ 18.

14. In addition to Dr. Sherry running the above search, NIH searched the emails of: Dr. Frances Collins, then-Director of NIH; Dr. Lawrence Tabak, then-Principal Deputy Director of NIH; Dr. Michael Lauer, Deputy Director for Extramural Research; and John Burklow, then-Director of the Office of Communications and Public Liaison ("OCPL") and Acting Chief of Staff in the OD. The first search used the keywords: "Jesse Bloom" and "Recovery of deleted deep sequencing data sheds more light on the early Wuhan SARS-CoV2 epidemic." The second search used the keyword: "jbloom@fredhutch.org," Dr. Bloom's email address. Garcia-Malene Suppl. Decl. ¶ 19.

15. OCPL searched for emails responsive to Item 4 of Request 56712. OCPL was the only place searched for Item 4 because Plaintiff specifically designated the NIH press office as the search location in Plaintiff's FOIA Request 56712, and OCPL serves as the agency's "press office." Garcia-Malene Suppl. Decl. ¶ 20.

16. To conduct its search, OCPL used the keywords "NIH statement sequence read archive" for the dates requested. These keywords were used because Item 4 specifically mentioned communications regarding the NIH statement on SRA. The following OCPL employees searched their emails: Amanda Fine, Acting Deputy Director of OCPL; Renate Myles, Acting Director of OCPL; and John Burklow. These individuals were targeted as custodians because they are part of OCPL leadership and would have been involved in the communications response to Dr. Bloom's article. Garcia-Malene Suppl. Decl. ¶ 21.

17. As a result of the searches mentioned in paragraphs 11 through 16, NIH identified, reviewed, and processed 1,202 pages of records. The records retrieved consisted of draft media

outreach materials and communications with the researcher/submitter and Dr. Bloom. Garcia-Malene Suppl. Decl. ¶ 22.

18. Of the 1,202 responsive pages NIH located, NIH released 238 pages to Plaintiff on February 7, 2022, in their entirety or in part, with information redacted pursuant to FOIA Exemptions 5 or 6. NIH released the remaining 964 pages, in whole or in part, to Plaintiff on May 13, 2022. Garcia-Malene Suppl. Decl. ¶ 23.

**2. FOIA Exemptions**

19. Upon reviewing materials for the *Vaughn* index, NIH realized that even though the release letter sent to Plaintiff on May 13, 2022 did not specifically mention Exemption 4, Exemption 4, 5 U.S.C. § 552(b)(4), was applied here to withhold the meeting identification and password for a ZoomGov meeting (this information had already been redacted pursuant to 5 U.S.C. § 552(b)(5)). The passcode and meeting identification are assigned to a specific individual and are not publicly available. The release of the passcode and meeting identification would permit Plaintiff to access future internal meetings, which typically discuss a great deal of commercial information that is privileged and confidential. Garcia-Malene Suppl. Decl. ¶ 25.

20. The deliberative process privilege (Exemption 5, 5 U.S.C. § 552(b)(5)) was applied here because much of the internal discussion among NIH staff members regarding the preprint, sequence submission procedures and policies for the SRA database, and public response strategy are deliberative and pre-decisional. A public response was published by multiple news outlets after these internal conversations occurred. Garcia-Malene Suppl. Decl. ¶ 27.

21. Upon reviewing materials for the *Vaughn* index, the attorney-client privilege exemption (Exemption 5, 5 U.S.C. § 552(b)(5)) was also applied to one email string (that had already been redacted under Exemption 5) to protect communications between an NIH employee who sought advice from the agency's legal counsel. Garcia-Malene Suppl. Decl. ¶ 29.

22. Exemption 6, which protects personal privacy, was applied here due to the heightened public scrutiny with anything remotely related to COVID-19. Consequently, all email addresses, direct telephone numbers, and identities of the researcher/submitter and NIH database curators that the researcher/submitter dealt with, have been withheld. Conversely, there is no public interest in the disclosure of this information. Garcia-Malene Suppl. Decl. ¶ 31.

23. NIH conducted a segregability review of the records released. Following its segregability review, NIH released the information, withholding only information subject to Exemptions 4, 5, or 6 of the FOIA and information that was so intertwined with exempt information that NIH could not reasonably segregate that information. Garcia-Malene Suppl. Decl. ¶ 32.

24. NIH further believes that material withheld, in whole or part, under Exemptions 5 and 6 was not appropriate for discretionary disclosure because of the amount of misinformation surrounding the COVID-19 pandemic and its origins. In addition, if NIH staff thought that their viewpoints, suggestions, and advice they offer during internal governmental deliberations on a charged topic such as the origins of the pandemic could be released to the public, they would be more guarded in offering their thoughts due to fears of public confusion, harassment, and unwanted hostile attention. This would impede the candid discussions necessary to make decisions regarding public policy surrounding COVID-19. Finally, disclosing signatures, email addresses and phone numbers of government employees does not aid the public in understanding the activities of the government, but instead only serves to invade the personal privacy of those identified. If released, this type of information could be used by the public to send threatening and harassing messages. Garcia-Malene Suppl. Decl. ¶ 33.

**B. Plaintiff's FOIA Request 57203**

**1. Searches**

25. On October 12, 2021, NIH received a FOIA request, dated September 30, 2021, from Plaintiff. Plaintiff's request sought the following NIH records:

> 1. All communications regarding the letter by Senators Grassley and Blackburn dated June 28, 2021.
>
> 2. All communications regarding the NIH's response to Senators Grassley and Blackburn dated September 8, 2021.
>
> 3. All communications regarding the letter by Senators Grassley and Blackburn dated September 16, 2021.

Garcia-Malene Decl. ¶ 28.

26. On the same day it received this request, October 12, 2021, NIH assigned Plaintiff's FOIA request the internal control number 57203. Garcia-Malene Decl. ¶ 30.

27. NIH's normal procedure for processing Congressional correspondence involves funneling all such correspondence through the OD's Executive Secretariat. This process was followed for the Congressional requests at issue. The Executive Secretariat houses all such correspondence in their "Synthesize, Analyze, Adjudicate and Vet Information" ("SAAVI") database system. Garcia-Malene Suppl. Decl. ¶ 40.

28. The Executive Secretariat searched the SAAVI database and used the keywords "Grassley," or "Blackburn," or both. These keywords were used because they were specifically mentioned in Plaintiff's FOIA Request 57203. Garcia-Malene Suppl. Decl. ¶ 42.

29. The Executive Secretariat searched SAAVI because it is the system of record for all NIH Director and Principal Deputy Directors records, and it houses the email accounts of the Immediate Office of the Director, where records related to Congressional requests would be found. Garcia-Malene Suppl. Decl. ¶ 41.

30. NIH did not search any individual email accounts in the Executive Secretariat given that Drs. Collins and Tabak's email accounts are already captured by SAAVI. Garcia-Malene Suppl. Decl. ¶ 43.

31. In addition to the NIH Director's Executive Secretariat, NIH searched for responsive records in OD's Office of Legislative Policy and Analysis ("OLPA") because the NIH Director's Executive Secretariat works closely with OLPA to ensure that all congressional correspondence is appropriately handled and vetted. Garcia-Malene Suppl. Decl. ¶ 44.

32. Following the above searches, NIH identified, reviewed, and processed approximately 794 pages of records, of which 17 pages were released in NIH's first production on February 7, 2022 and encompassed draft correspondence with Congress. NIH produced the remaining 777 pages of records to Plaintiff on May 13, 2022. Garcia-Malene Suppl. Decl. ¶ 45.

33. The Executive Secretariat and OLPA were the only places searched in response to Request 57203 because these locations are where the requested records are meant to be stored in the normal course of business. Garcia-Malene Suppl. Decl. ¶ 46.

**2. FOIA Exemptions**

34. The deliberative process privilege (Exemption 5) was applied here because the records in question were comprised of various drafts, including, but not limited to, Congressional correspondence showing NIH's draft responses beneath congressional questions, NIH's draft letter to Congress responding to the legislature's questions, and draft responses to Congress that had not been finalized. Garcia-Malene Suppl. Decl. ¶ 48.

35. Upon reviewing materials for the *Vaughn* index, the attorney-client privilege exemption was also applied to some emails strings that had already been redacted under Exemption 5 to protect communications between NIH employees and agency's legal counsel from whom the employees sought advice. Garcia-Malene Suppl. Decl. ¶ 49.

36. Exemption 6 was applied here due to the heightened public scrutiny of anything remotely related to COVID-19. Consequently, all email addresses, direct telephone numbers, and email addresses have been withheld. Garcia-Malene Suppl. Decl. ¶ 51.

37. NIH conducted a segregability review of the records released. Following its segregability review, NIH released the information, withholding only information subject to Exemptions 5 or 6 of the FOIA and information that was so intertwined with exempt information that NIH could not reasonably segregate that information. Garcia-Malene Suppl. Decl. ¶ 52.

38. As with Request 56712, NIH believes that the material withheld, in whole or part, under Exemptions 5 or 6 was not appropriate for discretionary disclosures. *See* Section I.A.2 ¶ 25, *supra*; Garcia-Malene Suppl. Decl. ¶ 53.

**C. Plaintiff's FOIA Request 57151**

39. On October 7, 2021, Defendant received another FOIA request from Plaintiff, dated September 30, 2021, which sought a copy of NIH's "log" of requests for records filed pursuant to the FOIA that also include "Date of Response" and "Request Status" columns from March 1, 2020 to present. NIH assigned this FOIA request an internal control number of 57151. Garcia-Malene Suppl. Decl. ¶¶ 34-35.

40. On December 17, 2021, NIH posted the responsive documents online. On December 23, 2021, NIH produced 130 pages of the same responsive records to Plaintiff. NIH did not withhold any information on the basis of any FOIA exemption. Garcia-Malene Suppl. Decl. ¶ 36.

**IV. Procedural History**

Plaintiff filed suit in this Court on November 17, 2021. It brought two counts: failure to comply with the statutory deadlines (Count I) and unlawful withholding of agency records (Count II). Compl. (Dkt. 1) ¶¶ 28-39. At the time of filing the Complaint, Plaintiff had not received any

responsive documents or been advised that any records were exempt from disclosure. *Id.* ¶ 38. After NIH produced responsive records on February 7, 2022, Plaintiff then sought leave to amend its complaint to account for the fact that NIH had, in fact, produced responsive records. Mot. for Leave (Dkt. 14). The Court granted Plaintiff's motion. (Dkt. 15).

Plaintiff's Amended Complaint contains three counts. Failure to comply with the statutory deadlines remains as Count I. Am. Compl. (Dkt. 16) ¶¶ 44-49. Plaintiff added two new counts: failure to conduct a search reasonably calculated to locate all responsive records (Count II) and unlawful withholding of agency records under 5 U.S.C. § 552(b)(5) and (b)(6) (Count III).[2] *Id.* ¶¶ 50-63. NIH answered the Amended Complaint on March 11, 2022. Answer (Dkt. 17).

## LEGAL STANDARD

Summary judgment resolves a FOIA action once a federal agency has produced the documents sought by a requester. *See Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 290 (4th Cir. 2004); *Wickwire Gavin,* 356 F.3d at 591. A summary judgment motion is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Therefore, the federal agency is entitled to summary judgment where there is no genuine issue of material fact that it has complied with the FOIA. *See Wickwire,* 356 F.3d at 591; *see also Havemann v. Colvin*, 629 F. App'x 537, 539 (4th Cir. 2015). To serve as a bar to summary judgment, a disputed fact must be "material," which means that it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[2] At summary judgment, however, the Court need only focus on Counts II and III. "The only question for summary judgment is whether the agency finally conducted a reasonable search, and whether its withholdings are justified. When exactly a reasonable search was conducted is irrelevant." *Hornbostel v. U.S. Dep't of Interior*, 305 F. Supp. 2d 21, 28 (D.D.C. 2003); *Perry v. Block*, 684 F.2d 121, 125 (4th Cir. 1982) ("*However fitful or delayed* the release of information under the FOIA may be, once all requested records are surrendered, federal courts have no further statutory function to perform.") (emphasis added).

(1986). And although the non-moving party is entitled to all reasonable, non-speculative inferences drawn in that party's favor, such inferences still must be justifiable from the evidence, and the non-moving party must present "significantly probative"—not "merely colorable"—evidence in its favor. *Id.* at 264.

## ARGUMENT

### I. NIH conducted searches reasonably calculated to lead to responsive records.

NIH's searches were reasonably calculated to lead to responsive records. "In responding . . . to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format[.]" 5 § U.S.C. 552(a)(3)(C). "[T]he FOIA does not require a perfect search" for responsive records from the agency, "only a reasonable one." *Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 362 (4th Cir. 2009). "[T]he relevant question is not whether every single potentially responsive document has been unearthed." *Carter, Fullerton & Hayes, LLC v. Fed. Trade Comm'n*, 601 F. Supp. 2d 728, 734 (E.D. Va. 2009). Rather, "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). A search is reasonably thorough so long as the places that are "likely to contain responsive materials" are searched. *Carter, Fullerton, & Hayes*, 601 F. Supp. 2d at 734. This means that a search remains reasonably thorough, even if responsive materials "may have [been] missed." *Iturralde*, 315 F.3d at 315. The agency "has the burden of establishing the adequacy of its search and that any identifiable document has . . . been produced[.]" *Heily v U.S. Dep't of Commerce*, 69 F. App'x 171, 173 (4th Cir. 2003) (citing *Carney v. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994)). "This burden may be met through affidavits explaining the manner in which the search was conducted." *Id.* "The court is entitled to accept the credibility of such affidavits, so long as it has no reason to question the good faith of the agency." *Id.* (citations and internal quotation marks omitted).

Here, through the declaration of its FOIA officer, NIH has adequately explained the steps it took to locate records responsive to Plaintiff's FOIA requests.

**A. NIH conducted an adequate search for responsive records for Request 56712.**

Generally speaking, Plaintiff's Request 56712 sought communications related to the withdrawal of data from SRA and Jesse Bloom's article on the same. Garcia-Malene Decl. ¶ 10. NIH's searches were reasonably calculated to locate records responsive to this request.

Items 1 and 2 of Plaintiff's FOIA request sought "all communications" regarding the request to post, and later withdraw, COVID-19 genetic sequences to SRA. *Id.* The requests were time-limited—March 1, 2020 to March 31, 2020, for the request to post the sequence, and June 1, 2020 to June 31, 2020 to remove the sequence. *Id.* At NIH, SRA is hosted by NCBI and NLM. Garcia-Malene Suppl. Decl. ¶ 15. With this in mind, NIH searched NCBI's communication-tracking database to find correspondence from the researcher requesting that their data be withdrawn. *Id.* ¶ 16. That database was selected because it houses communications about SRA and submitted sequences. *Id.* NIH used the project identification associated with the withdrawn sequence (PRJNA612766) as a keyword to pull responsive documents from the database within the date range Plaintiff requested. *Id.*

Item 3 sought communications related to Jesse Bloom's preprint on the withdrawn data. Garcia-Malene Decl. ¶ 10. This request was two-fold: it sought both communications between Jesse Bloom and NIH from January 1, 2021 to the date of the request and it also sought internal NIH communications about the preprint from June 21, 2021 to June 25, 2021. *Id.* NIH conducted two different searches. First, it searched the email of Stephen Sherry, Acting Director of NCBI and NLM during the relevant time period. Garcia-Malene Suppl. Decl. ¶ 17. As acting director, Dr. Sherry would have been involved in communications about Dr. Bloom's preprint. *Id.* Dr. Sherry used the keywords "preprint," "jesse bloom" or "biorxiv" to search his email for the dates

requested, as Dr. Bloom's preprint was published on bioRxiv, "the server for biology preprints." *Id.* ¶ 18.

NIH also searched the email accounts of some of NIH's senior leadership: Dr. Collins, Dr. Tabak, Dr. Lauer, and Burklow.[3] *Id.* ¶ 19. The first additional search used the keywords: "Jesse Bloom" and "Recovery of deleted deep sequencing data sheds more light on the early Wuhan SARS-CoV2 epidemic," the title of Dr. Bloom's article. The second additional search used the keyword: "jbloom@fredhutch.org," Dr. Bloom's email address. *Id.*

The final item from Request 56712, Item 4, sought communications in the June 21, 2021 to June 25, 2021 time period, "to, from, and within" the NIH press office about a statement released on June 23, 2021 regarding the withdrawn data. Garcia-Malene Decl. ¶ 10. OCPL was the only location searched because Plaintiff specifically designated the NIH "press office" in the request. *Id.* ¶10; Garcia-Malene Suppl. Decl. ¶ 20. OCPL used the keywords "NIH statement sequence read archive" to search the emails of OCPL leadership: Amanda Fine, Acting Deputy Director of OCPL; Renate Myles, Acting Director of OCPL; and Burklow, Acting Chief of Staff in the OD and former Director of OCPL.[4] Garcia-Malene Suppl. Decl. ¶ 21.

NIH has described where it searched for records responsive to Request 56712 and why those locations were logical places to search. Accordingly, NIH conducted an adequate search.

**B. NIH conducted an adequate search for responsive records to Request 57203.**

---

[3] During this litigation, Plaintiff requested that NIH search these four individuals' email accounts. Garcia-Malene Suppl. Decl. ¶ 19.

[4] John Burklow became Acting Chief of Staff in the OD in April 2021. Prior to assuming this position, he served for many years as NIH's Associate Director for Communications and Public Liaison and Director of the Office of Communications and Public Liaison. *John T. Burklow*, NIH, available at https://www.nih.gov/institutes-nih/nih-office-director/john-t-burklow#:~:text=John%20Burklow%20became%20Acting%20Chief,of%20Health%20and%20Human%20Services. (last accessed June 9, 2022).

In general, Plaintiff's Request 57203 asked for communications "regarding" letters sent to NIH from Senators Grassley and Blackburn, dated June 28, 2021, September 8, 2021, and September 16, 2021. Garcia-Malene Decl. ¶ 28. NIH funnels all Congressional correspondence through the OD's Executive Secretariat. Garcia-Malene Suppl. Decl. ¶ 40. The Executive Secretariat houses all such correspondence in their "Synthesize, Analyze, Adjudicate and Vet Information" ("SAAVI") database system. *Id.* SAAVI is the system of record for all NIH Director and Principal Deputy Director records and houses the email accounts of the immediate Office of the Director. *Id.*

NIH searched the SAAVI database for records responsive to Request 57203 using the keywords "Grassley" and "Blackburn." *Id.* ¶ 41. NIH did not search any individual email accounts in the Executive Secretariat given that Drs. Collins and Tabak's email accounts were already captured by SAAVI. *Id.* In addition to SAAVI, NIH searched for responsive records in OD's Office of Legislative Policy and Analysis ("OLPA") because the Executive Secretariat works closely with OLPA to ensure that all congressional correspondence is appropriately handled and vetted. *Id.* ¶ 44.

NIH searched for Congressional correspondence in the two places those records were most likely to exist, and therefore its search was adequate.

**II. NIH properly redacted information pursuant to express statutory exemptions.**

The FOIA requires an agency "to disclose agency records unless they may be withheld pursuant to one of nine enumerated exemptions listed in § 552(b)." *Heily*, 69 F. App'x at 173. The agency bears the burden of establishing the applicability of an exemption. *Id.* "In order to carry this burden, an agency must submit sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both[.]" *Nat'l Sec. Council v. Cent. Intel. Agency*, 206 F. Supp. 3d 241, 249 (D.D.C. 2016), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020). These materials, in whichever form,

"demonstrate that the government has analyzed carefully any material withheld," allow the court "to fulfill its duty of ruling on the applicability of the exemption," and permits "the adversary system to operate by giving the requester as much information as possible, on the basis of which the requester's case may be presented to the trial court." *Id.*

Here, as explained by the NIH's FOIA Director *and* demonstrated in two *Vaughn* indices, NIH's productions contained statutorily-permissible redactions under 5 U.S.C. § 552(b)(5) ("Exemption 5") and 5 U.S.C. § 552(b)(6) ("Exemption 6").[5]

**A. NIH properly redacted information pursuant to Exemption 5.**

Exemption 5 shields "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "As the text indicates—albeit in a less-than-straightforward way—this exemption

---

[5] To the extent that Plaintiff challenges the application of Exemption 4 to ZoomGov meeting identification number and passcode (which was added when NIH was preparing the *Vaughn* indices in this litigation), that challenge fails. As an initial matter, at the time the records were released to Plaintiff, NIH withheld this information on the basis of the deliberative process privilege. *See Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 2021 WL 825985, at *22 (D. Colo. Mar. 4, 2021) (protecting information under deliberative process privilege); Garcia-Malene Decl., Attach. E; Garcia-Malene Suppl. Decl., Attach. I. But on the merits, NIH properly asserted Exemption 4 over this information as well. Exemption 4 shields "commercial or financial information obtained from a person" and that is "privileged or confidential." 5 U.S.C. § 552(b)(4). Courts have protected government conference numbers under other FOIA exemptions using a similar rationale to what NIH asserts here under Exemption 4—"the agency teleconference numbers and passcodes are shared internally for the purpose of conducting official business," *Rocky Mountain Wild,* 2021 WL 825985, at *9, and "disclosure would allow taxpayers to eavesdrop" on sensitive, possibly privileged, conversations, *see, e.g.*, *Highland Capital Mgmt., LP v. Internal Revenue Serv.*, 408 F. Supp. 3d 789, 817-18 (N.D. Tex. 2019) (protecting information under Exemption 7(e)). Here, as explained in the *Vaughn* index, the ZoomGov information is specific to the individual (*i.e.*, every NIH employee has his or her own ZoomGov meeting identification and passcode) and the information is not otherwise publicly available. *Vaughn* I at 15 (211); 16 (270). ZoomGov is used by NIH employees to conduct official NIH business, which may include sensitive or privileged conversations. *Id.* The release of this login information to the public would permit third parties to access future calls and listen to internal, pre-decisional deliberations, confidential commercial information, and personal privacy information regularly discussed during these internal calls. *Id.* Accordingly, NIH properly withheld this information from disclosure pursuant to Exemption 4, in addition to its previously-claimed exemption under the deliberative process privilege.

incorporates the privileges available to Government agencies in civil litigation." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021). This includes the attorney-client privilege and the deliberative process privilege. *Id.*; *Solers, Inc. v. Internal Revenue Serv.*, 827 F.3d 323, 329 (4th Cir. 2016). NIH properly applied those privileges here.

**1. NIH properly withheld information based on the deliberative process privilege.**

The deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news." *Solers*, 827 F.3d at 329. To justify application of the privilege, the context in which the materials were used must be "both pre-decisional and deliberative." *Id.* "Pre-decisional documents are those prepared in order to assist an agency decisionmaker in arriving at his decision, and deliberative documents are those that reflect the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes." *Id.* (cleaned up). "The privilege thus protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* (emphasis omitted).

As a preliminary matter, NIH has articulated the harm from disclosure of any of the documents protected by the deliberative process privilege. *See Judicial Watch v. Dep't of State*, 557 F. Supp. 3d 52, 60-61 (D.D.C. 2021) (discussing reasonably foreseeable harm requirement under deliberative process privilege). The withheld materials here are NIH employees' deliberations on a sensitive and nuanced matter—the COVID-19 pandemic and its origins. Release of these materials would chill the employees' frank internal discussions in future public health crises, as well as the ongoing COVID-19 pandemic. Garcia-Malene Suppl. Decl. ¶¶ 33, 53; *see Leopold v. U.S. Dep't of Just.*, 2021 WL 3128866, at *4 (D.D.C. July 23, 2021) ("release of these discussions, especially given the high-profile and sensitive nature of this case, would dampen the free exchange of ideas within the

agency."). Additionally, non-final statements—which may not have been subject to as extensive fact-checking as a final statement—could be used out of context and serve to amplify the already prevalent misinformation regarding the origins of the pandemic. Garcia-Malene Suppl. Decl. ¶¶ 33, 53. Disclosing these pre-decisional, back-and-forth drafts "would ultimately damage the intra-agency decision-making process and the public perception of the department." *Leopold*, 2021 WL 3128866, at *4.

The materials NIH withheld pursuant to the deliberative process privilege can be divided into the following categories: advice on responding to public inquiries about the data withdrawal from SRA; draft Congressional correspondence and strategy on the same; and draft documents about future agency action. As described below, each category of documents meets the requirements for the deliberative process privilege, and NIH appropriately withheld the materials on that basis.

**a. NIH properly withheld information related to government employees seeking advice on how to respond to public inquiries about Dr. Bloom's paper.**

NIH properly withheld information related to discussions among NIH employees on the best approach to responding to inquiries—from the media, Dr. Bloom, and the public at large—about the data withdrawal from SRA.

Internal discussions about how to respond to media inquiries—which are, in effect, "deliberations about policy"—are protected by the deliberative process privilege. *Comm. on Oversight and Gov't Reform v. Lynch*, 156 F. Supp. 3d 101, 112 (D.D.C. 2016). As one district court has stated, this conclusion "is inescapable: if agency deliberations about public statements were FOIA-able, then agencies would be hamstrung in their dealings with the press, defeating the very transparency FOIA aims to foster." *Id.*; *see also Judicial Watch v. Dep't of Homeland Sec.*, 736 F. Supp. 3d 202, 208 (D.D.C. 2010) (holding documents about "how to respond to on-going inquiries from the press and

Congress" fell under the deliberative process privilege); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Labor*, 478 F. Supp. 2d 77, 83 (D.D.C. 2007) (finding that deliberative process privilege covered email messages discussing the agency's response to news article); *Judicial Watch, Inc. v. Reno*, 2001 WL 1902811, *3 (D.D.C. Mar. 30, 2001) (holding that deliberations about "how to handle press inquiries and other public relations issues" are covered by the deliberative process privilege).

Here, NIH has withheld parts of emails that discuss how to handle the response to media inquiries about the researcher's request to withdraw data from the SRA. NIH was asked to comment in advance of articles published on June 23, 2021 in national news outlets. *See, e.g.*, *Vaughn* I at 14-15 (189-90)[6]; *Vaughn* II at 3-4 (440-443); 4-6 (454-461); 6-7 (469-74); *see also* DEX 5 ("We have additional media questions that need responses from NLM; I've put with I have but please correct/add as needed."). These emails, dated June 21, 22, and 23, 2021, discussed an appropriate response to the *Wall Street Journal* and other outlets[7] and were written before the agency issued any final public statement about Dr. Bloom's paper. Furthermore, they are deliberative in that they represent the "give and take" between various offices at NIH on how to respond questions to about SRA and the withdrawn data.

Additionally, NIH withheld portions of emails that contain talking points, "documents prepared by government employees for the consideration of government decision-makers." *Am.*

---

[6] *Vaughn* I (DEX 3) corresponds to NIH's February 7, 2022 production, whereas *Vaughn* II (DEX 4) corresponds to NIH's May 13, 2022 production. The citation *Vaughn* II at 24 (35) directs to *Vaughn* II, Page 24 (found in bottom right corner), document page 35 (first column) ("Attachment of draft responses to Congressional letter from Senators Grassley and Blackburn dated September 16, 2021").

[7] Amy Dockser Marcus, Betsy, McKay, Drew Hinshaw, *Chinese Covid-19 Gene Data That Could Have Aided Pandemic Research Removed From NIH Database*, WALL STREET J. (June 23, 2021), https://plus.lexis.com/api/permalink/a25d7c9f-670d-4f2f-b199-ba78e38f8490/?context=1530671; Carl Zimmer, Scientist Finds Early Virus Sequences That Had Been Mysteriously Deleted, N.Y. TIMES (June 23, 2021), https://www.nytimes.com/2021/06/23/science/coronavirus-sequences.html.

*Ctr. for L. & Just. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 162, 173 (D.D.C. 2018). Talking points are also protected by the deliberative process privilege, including the "final" version. *Id.* As one court noted, "the 'final' version of talking points prepared by more junior staffers for a more senior official is rarely the final decision about what the senior official will say." *Id.* "Rather, a senior official . . . may elect to use all, some, or none of the talking points prepared for her." *Id.* Here, the "QA" (question and answer) document that NIH employees prepared for senior leadership is protected by the deliberative process privilege. It represents NIH employees' collective thinking about how to respond to inquiries that NIH might receive after Dr. Bloom's article was published. *See, e.g.*, *Vaughn* I at 3-4 (20-22) (describing withheld material as "internal pre-decisional discussion among NIH employees composing a draft reactive statement and a QA in view of the anticipated posting of Dr. Bloom's paper"); 16 (215-16). The QA document was created before the June 23, 2021 news articles. *Vaughn* I at 3-4 (20-22); 16 (215-16). Thus, the QA is pre-decisional—prepared before NIH made any public statement, either to the media or Dr. Bloom—and reflects the "give and take" of various NIH employees discussing the most appropriate response.

NIH also withheld materials under the deliberative process privilege where NIH employees were discussing how to respond to inquiries from Dr. Bloom. *See, e.g.*, *Vaughn* I at 7 (87); *Vaughn* II at 14 (625). These materials, too, were prepared before the agency responded to Dr. Bloom and reflect NIH employees' discussions that ultimately informed the agency's response to Dr. Bloom.

Finally, NIH withheld parts of documents where NIH employees discussed NIH policy on SRA. These internal conversations occurred prior to NIH making any public statement about the withdrawn data and ultimately informed those statements. These emails were a back-and-forth discussion about NIH's current SRA policies and the impact Dr. Bloom's article and attendant press coverage might have on those policies going forward. *Vaughn* I at 17 (221-23). Thus, for the reasons discussed above, these documents were both pre-decisional and deliberative.

**b. NIH properly withheld strategy discussions about responding to Congressional inquiries, draft correspondence, and discussions about future agency actions.**

NIH properly withheld discussions of strategy about replying to Congressional requests, drafts of that correspondence, and future agency actions pursuant to the deliberative process privilege.

Strategy about how to respond to Congressional inquiries and drafts of responses are "by their nature, 'pre-decisional' and prototypically 'deliberative.'" *Bell v. Dep't of Def.*, 2018 WL 4637005, at *14 (D.D.C. Sept. 27, 2018); *see also Citizens for Resp. & Ethics in Wash. v. Gen. Servs. Admin.*, 2021 WL 1177797, at *9 (D.D.C. Mar. 29, 2021) (citing cases and finding GSA appropriately withheld records that included deliberations regarding how GSA would move forward with responding to questions for the record from a Senate committee).

Here, NIH employees from across the agency—NLM, which hosts the SRA, OPLA, and members of the Director's staff— discussed via email how to respond to the letters sent by Senators Grassley and Blackburn, the subject of Request 57203. *See, e.g.*, *Vaughn* II at 21 (6-8) ("internal, pre-decisional discussion among NIH employees discussing draft responses to the June 28, 2021 letter by Senators Grassley, Blackburn and Marshall); *see also* DEX 6 (email from Teresa Zayas Cabán, Ph.D., Assistant Director for Policy Development at NLM, circulating draft letter to Senators Grassley and Blackburn for review). These discussions occurred before NIH formally responded to the letters and reflect the exchange of ideas between NIH staff members about the SRA and its policies.

Additionally, NIH properly withheld materials concerning discussions about future agency action, including a communication strategy about an SRA review plan, discussions about which documents were responsive to certain FOIA requests, and the timing of the agency's response to Congressional requests. *See, e.g.*, *Vaughn* I at 12-13 (170-71) (discussion about response to FOIA

requests); *Vaughn* II at 25 (39) (status of various Congressional inquiries); 62 (522-25) (draft communications strategy for SRA review).

"In the course of its day-to-day activities, an agency often needs to rely on the opinions and recommendations of its own employees[.]" *Bell*, 2018 WL 4637005, at 14. "[T]hat is an integral part of its deliberative process; to conduct this process in public view would inhibit frank discussion of policy matters and likely impair the quality of decisions." *Id.* Here, NIH employees discussed future agency actions that had yet to be finalized. These discussions took place before the agency took any final action and reflected the candid thoughts of NIH employees. Therefore, it was appropriate for NIH to withhold these materials pursuant to the deliberative process privilege.

**2. NIH properly withheld information pursuant to the attorney-client privilege.**

The attorney-client privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Judicial Watch, Inc. v. Dep't of Treasury*, 802 F. Supp. 2d 185, 200 (D.D.C. 2011). Like the deliberative process privilege, the attorney-client privilege's purpose is to promote free and open communication, ensuring that clients may be honest with their attorneys and that their confidences are protected. *Competitive Enter. Inst. v. U.S. Env't Prot. Agency*, 232 F. Supp. 3d 172, 184 (D.D.C. 2017). "In the context of FOIA, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Id.*

Here, NIH properly withheld information where NIH employees were seeking legal advice from NIH attorneys. For example, in the course of preparing responses to Congressional letters, an NIH employee wrote to NIH legal counsel seeking legal advice on how to respond to a Congressional inquiry. *Vaughn* II at 82 (710). NIH's counsel responded with legal analysis. *Vaughn* II at 82 (709). Similarly, in another example, NIH employees asked NIH's legal counsel to review proposed responses to Congress. *Vaughn* II at 43-44 (207, 216-33); *see also* DEX 7 (email to A.

Jacobs, senior attorney, seeking legal review); DEX 8. These emails, between the client and the attorney, for the purpose of providing legal advice, fall squarely within the attorney-client privilege. As such, NIH properly withheld them.

**B. NIH properly redacted individuals' names and contact information pursuant to Exemption 6.**

NIH properly applied Exemption 6 to protect from disclosure the names and contact information of individual NIH employees, the name and email address of the researcher who requested removal of the sequence from SRA, and the personal email addresses of third parties.

Exemption 6 safeguards from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(6). Determining whether Exemption 6 applies is a two-step process. "First, the file must be identified as the type considered by statute," *i.e.*, a file similar to a personnel or medical file. *Judicial Watch, Inc. v. U.S. Dep't of* State, 875 F. Supp. 2d 37, 46 (D.D.C. 2012). If the information is contained in a "similar file," "courts employ a balancing test that weighs the individual's privacy interests against the public's interest in disclosure." *Solers*, 827 F.3d at 332.

**1. The emails are "similar files" under the statute.**

Turning first to whether the records, which are emails, fall within the type of file protected by Exemption 6, the phrase "similar files" "sweeps broadly and has been interpreted by the Supreme Court to mean detailed Government records on an individual which can be identified as applying to that individual." *Solers*, 827 F.3d at 332. "[T]the protection of an individual's right of privacy, which Congress sought to achieve by preventing the disclosure of [information] which might harm the individual, surely was not intended to turn upon the label of the file which contains the damaging information." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 601 (1982). Therefore, "a record need not be like a personnel file in the sense that it is employment-related or a medical file in the sense that it contains a record of a person's medical history or medical treatment and care." *Cook v.*

*Nat'l Archives & Records Admin.*, 758 F.3d 168, 174 (2d Cir. 2014). "Indeed, the record need not even be a 'file.'" *Id.* Nor does the information in the file need to be "intimate": "the threshold for application of Exemption 6 is crossed if the information merely applies to a particular individual." *N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc).

"Courts have considered emails and correspondence files 'similar files' in recent years." *Judicial Watch, Inc. v. U.S. Dep't of* State, 875 F. Supp. 2d 37, 46-47 (D.D.C. 2012) (citing cases). Here, NIH redacted names and email addresses, and in some cases phone numbers, from NIH emails. "The emails here, which contain names, titles, offices and phone numbers, qualify as similar files because they contain personal information about the named government personnel." *Id.* The first step in the Exemption 6 analysis is therefore met.

**2. Releasing the withheld names and email addresses would be "a clearly unwarranted invasion of privacy."**

Having met the threshold inquiry, the question becomes whether disclosure would constitute "a clearly unwarranted invasion of privacy." *Solers*, 827 F.3d at 332. "To determine whether an invasion of privacy would be 'clearly unwarranted,' courts employ a balancing test that weighs the individual's privacy interests against the public interest in disclosure." *Id.* The public interest is served to "the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Id.*; *see also Milton v. U.S. Dep't of Just.*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011). "Conversely, there is no public interest in disclosure of information about private citizens that reveals little or nothing about an agency's own conduct." *Milton*, 783 F. Supp. 2d at 58. NIH withheld information under Exemption 6 about three categories of individuals: telephone and email addresses for NIH employees; the name and contact information of the researcher who requested that the data be withdrawn from the SRA; and the personal email addresses of third parties like Dr. Bloom and journalists.

**a. The email addresses and phone numbers of NIH employees do not shed any light on how NIH functions.**

Here, NIH properly withheld the names and email addresses of NIH employees because on balance, there is little public interest in learning their identities and substantial privacy interests in keeping their identities confidential. In *Solers*, the Fourth Circuit considered whether Exemption 6 shielded the names of two Internal Revenue Service ("IRS") employees who were consulted in connection with the plaintiff's audit. 827 F.3d at 332. "On the one side of the scale, IRS employees, as well as other government employees, have a substantial interest in the nondisclosure of their identities and their connection with particular investigations because of the potential for future harassment, annoyance, or embarrassment." *Id.* at 333. "But, on the other side of the scale in this case, the record contains no indication that disclosing the names and contact information of these IRS employees would serve the public interest." *Id.* (emphasis in original). The Fourth Circuit held the IRS properly withheld the names and contact information of the IRS employees, citing to one of its unpublished opinions, *Judicial Watch, Inc. v. United States*. In that case, the Fourth Circuit found that "the public interest in the names of government employees alone would appear to be negligible 'absent a compelling allegation of agency corruption or illegality[.]'" 84 F. App'x 335, 339 (4th Cir. 2004) (quoting *Neely v. FBI*, 208 F.3d 461, 464 (4th Cir. 2000) (considering propriety of withholding names and identifying information of FBI agents, other government employees, third-party suspects, and third parties under Exemption 7(C))).

The Fourth Circuit has not explicitly stated whether a plaintiff must make a "compelling allegation of agency corruption or illegality" to assert a public interest favoring disclosure under Exemption 6. But this Court need not decide whether such a "compelling allegation" is required. Plaintiff cannot articulate *any* public interest—as that phrase is defined under Exemption 6 of FOIA—in learning the names and email address of NIH employees who responded to the request to withdraw the sequence from the SRA. Plaintiff concedes as much in both its FOIA request and

its Amended Complaint. In Request 56712, Plaintiff noted that "[s]equences of SARS-CoV-2 virus are critical to understanding how this pandemic . . . started, in order to prevent future pandemics. Furthermore, the State Department has noted that China has not been transparent in its handling of the SARS-CoV-2 origin question and has removed virus sequences from its own online databases that could help uncover how the pandemic started." Garcia-Malene Decl., Attach. A, at 1. In its Amended Complaint, Plaintiff posits that "the public thus has significant interest in understanding *the reason why* these early sequences were removed from the SRA," noting the death toll from COVID-19. Am. Compl. ¶¶ 10-11 (emphasis added). Notably, Plaintiff does *not* allege that learning the names and email addresses of the NIH employees who processed the data withdrawal will "shed light" on why these sequences were removed. Nor can it. Learning the names and email addresses of the individual NIH employees does not help the public understand why the sequences were removed or how the pandemic started. Therefore, there is little public interest in releasing the names and email addresses of these NIH employees. *See U.S. Dep't of Just. v. Reporters' Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) ("The deletions were unquestionably appropriate because the names of the particular cadets were irrelevant to the inquiry into the way the Air Force Academy administered its Honor Code"); *Smith v. U.S. Dep't of Treasury*, 2020 WL 376641, at *5 (D.D.C. Jan. 23, 2020).

On the other hand, there is a substantial privacy interest for these NIH employees in "avoiding embarrassment, retaliation or harassment and intense scrutiny by the media that would likely follow disclosure." *Judicial Watch*, 875 F. Supp. 2d at 46. Given the interest in the COVID-19 pandemic, if members of the public believe Plaintiff's narrative that there was something untoward about NIH's decision to remove the data from the SRA, disclosure of this information could lead to harassing and threatening emails to NIH employees. Garcia-Malene Suppl. Decl. ¶¶ 33, 53; *see also* Paul Duggan, *Man Pleads Guilty to Federal Charge of Threatening Anthony Fauci*, WASHINGTON POST

(May 23, 2022), https://www.washingtonpost.com/dc-md-va/2022/05/23/fauci-death-threats-guilty-plea/ (describing threats sent to Dr. Fauci, the nation's top COVID-19 advisor, his family, and Dr. Collins, then-Director of NIH). Disclosure of the NIH employees' names and email addresses could also lead to undesired media contact, where, as here, the topic (origins of COVID-19) "continues to receive substantial press coverage." *Judicial Watch*, 875 F. Supp. 2d at 46 ("While lobbyists . . . may be prepared to weather intense media attention, the same may not necessarily be said for the White House Security Staff."). Indeed, Plaintiff's FOIA requests, Amended Complaint, and appeal letters are rife with citations to various news articles surrounding not only the COVID-19 pandemic, but the origins of the pandemic and the removal of the sequence from the SRA, the specific items Plaintiff hopes to investigate through its FOIA requests. The lack of any public interest, coupled with the potential for harassment and unwanted media attention, means NIH was correct to withhold this information.

**b. The researcher who requested to withdraw their data is entitled to protection under Exemption 6.**

The same result holds for NIH's withholding of the name and email address of the researcher who requested that their prior submission to the SRA be withdrawn. That researcher is affiliated with Wuhan University in Wuhan, China. Garcia-Malene Suppl. Decl. ¶ 16. Notably, courts have afforded foreign nationals the same privacy rights under FOIA as they afford U.S. citizens. *See U.S. Dep't of State v. Ray*, 502 U.S. 164, 175-79 (1991) (applying traditional analysis of privacy interests under FOIA to Haitian nationals); *Graff v. FBI*, 822 F. Supp. 2d 23, 34 (D.D.C. 2011) (holding, in a case involving redactions under Exemption 7(C), "foreign nationals are entitled to the privacy protections embodied in FOIA"); *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 n.4 (D.D.C. 2007) (stating that "courts in our Circuit have held that foreign nationals are entitled to the same privacy rights under FOIA as United States citizens"); *Schiller v. INS*, 205 F. Supp. 2d 648, 662 (W.D. Tex. 2002) (finding, in a case involving redactions under 7(C), that "[a]liens

[and] their families . . . have a strong privacy interest in nondisclosure of their names, addresses, and other information which could lead to revelation of their identities"); *Judicial Watch, Inc. v. Reno*, 2001 WL 1902811, at *8 (D.D.C. Mar. 30, 2001) (protecting asylum application filed on behalf of Cuban émigré). "Even if a third party's status as a foreign national gives rise to a privacy interest that is somewhat weaker than that of a U.S. citizen, given the structure of the statute, even a weak privacy interest will always outweigh the lack of public interest." *Graff*, 822 F. Supp. 2d at 34.

In its appeal letter to NIH, Plaintiff argued that the researcher from Wuhan University, a public institution, was a "government official[] operating in their official capacity" and thus their identity should be made public. Garcia-Malene Decl., Attach. G, at 19. In *Pinson v U.S. Department of Justice*, the District Court for the District of Columbia rejected a similar argument. The plaintiff in that case argued that there was a great public interest in learning about the participation of foreign government representatives in an FBI investigation, specifically the identities of those foreign nationals who had worked with the FBI. 177 F. Supp. 3d 56, 87-88 (D.D.C. 2016). The FBI had provided documents that identified participation of foreign governments in its investigations, but had withheld the names of the individual foreign nationals who worked on the investigations. *Id.* at 87. The district court found that these redacted documents "shed light on how the FBI gathers and coordinates information . . . effectuating the purpose of FOIA." *Id.* The FBI had appropriately withheld the names of individual foreign nationals because "the public interest is in the disclosure of the foreign government's participation, not of the identifying information of each individual foreign official." *Id.* at 87-88.

The district court's logic in *Pinson* applies here. The public interest is in the disclosure that a researcher affiliated with Wuhan University requested that previously-submitted COVID-19 sequences be removed from the SRA. Learning the identity of the researcher does nothing to "shed light on [NIH's] performance of its statutory duties" and disclosure of information about the

researchers "shows little or nothing about an agency's conduct." *Smith*, 2020 WL 376641, at *4; *see also Osen LLC v. U.S. Central Command*, 2019 WL 4805805, at *11 (S.D.N.Y. Sept. 30, 2019) ("The public's interest in having the information for its own sake falls outside the Act's scope.").

**c. There is no public benefit to releasing the private email addresses of Dr. Bloom and journalists.**

Finally, the logic above—the risk of embarrassment or invasion of privacy balanced against whether that information would shed light on how the government operates—applies with even more force to third parties like journalists or researchers whose private email addresses NIH withheld. *See, e.g.*, *Vaughn* I at 1 (1-2); *Vaughn* II at 14 (630, 632). Knowing the personal email of Dr. Bloom or a journalist does not provide any information about the SRA; it simply publishes information that leaves those individuals vulnerable to unwanted attention. Accordingly, NIH appropriately withheld this information under Exemption 6.

**CONCLUSION**

For the foregoing reasons, NIH respectfully requests that this Court grant NIH's motion for summary judgment.

Dated: June 10, 2022

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: /s/

MEGHAN LOFTUS
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3757
Fax: (703) 299-3983
Email: meghan.loftus@usdoj.gov

*Counsel for Defendant*