**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1141

EMPOWER OVERSIGHT WHISTLEBLOWERS & RESEARCH,

Plaintiff - Appellant,

v.

NATIONAL INSTITUTES OF HEALTH,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:21-cv-01272-LMB-JFA)

Argued: September 25, 2024                    Decided: November 26, 2024

Before AGEE, THACKER, and HEYTENS, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Agee and Judge Heytens joined.

**ARGUED:** Jeffrey Steven Beelaert, STEIN MITCHELL BEATO & MISSNER LLP, Washington, D.C., for Appellant. Meghan Elizabeth Loftus, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

THACKER, Circuit Judge:

This case concerns a Freedom of Information Act ("FOIA") dispute. Empower Oversight Whistleblowers & Research ("Appellant") appeals the award of summary judgment to the National Institutes of Health ("NIH"). Appellant alleges that NIH failed to meet the FOIA statutory deadlines and also that NIH did not conduct adequate searches and improperly withheld documents in response to document requests it made to NIH.

Because there is no standalone cause of action for a violation of FOIA deadlines, the searches conducted by NIH were adequate, and NIH properly withheld the challenged documents, we affirm the grant of summary judgment.

# I.

In June 2021, American virologist, Jesse Bloom ("Bloom"), published an article about the origin of the COVID-19 pandemic ("the Bloom article"). Bloom wrote that a set of sequencing data regarding the origin of COVID-19[1] had been withdrawn from the NIH Sequence Read Archive ("SRA"). The SRA is hosted by the National Center for Biotechnology Information ("NCBI") at the National Library of Medicine, which is an NIH component. Shortly after the publication of the Bloom article, Senators Chuck Grassley and Marsha Blackburn sent NIH a letter seeking agency records and responses to questions about the removal of the sequence. NIH responded to each question.

---

[1] Sequencing data is the genetic makeup of the SARS-CoV-2 virus. The SRA is an open access archive of data.

NIH is the medical research agency for the United States. It consists of the Office of the Director ("OD") and twenty-seven sub institutes and centers, one of which is the NCBI. The OD contains several offices, two of which are relevant here. The Office of Communication and Public Liaison ("OCPL") is responsible for communicating information about NIH to the public. The Office of Legislative and Policy Analysis ("OLPA") is responsible for developing policy and provides analysis to, and communication with, Congress.

Following the publication of the Bloom article, Appellant used the FOIA statutory scheme to request documents from NIH. From July to September 2021, Appellant sent three FOIA requests to NIH. Appellant submitted the first FOIA request ("First Request") on July 14, 2021, seeking:

1) All communications regarding the request to post the SARS-CoV-2 sequences to the Sequence Read Archive in March 2020. This request covers all communications between March 1, 2020, to March 31, 2020.

2) All communications regarding the request to withdraw the SARS-CoV-2 sequences from the Sequence Read Archive in June 2020. This request covers all communications inside the NIH regarding the preprint from June 21, 2021, to the present.

3) All communications regarding these withdrawn sequences as reported by a preprint titled "Recovery of deleted deep sequencing data sheds more light on the early Wuhan SARSCoV-2 epidemic" by Jesse Bloom, a virologist at the Fred Hutchinson Cancer Research Center. This request covers all communications between Jesse Bloom and the NIH, from January 1, 2021, and the present. This request covers all communications inside the NIH regarding the preprint from June 21, 2021, to the present.

4) All communications to, from, and within the NIH press office about the NIH statement released on June 23, 2021, and about reports that these sequences were removed from the Sequence Read Archive. This includes all emails related to the drafting of the statement, communications about the reported removal, and communications with reporters. This request covers all communications between June 21, 2021, to June 25, 2021.

J.A. 26.[2]

Appellant sought expedited processing for the First Request. Appellant claimed that the importance of understanding the origin of the COVID-19 pandemic and the purported relationship between the removal of the SRA sequence and that knowledge required expedited processing.

The next month, on September 30, 2021, Appellant submitted its second FOIA request ("Second Request"), seeking:

1) All communications regarding the letter by Senators Grassley and Blackburn dated June 28, 2021.

2) All communications regarding the NIH's response to Senators Grassley and Blackburn dated September 8, 2021.

3) All communications regarding the letter by Senators Grassley and Blackburn dated September 16, 2021.

J.A. 30.

Appellant also sought expedited processing for the Second Request, again citing the need to understand the origin of the pandemic and the public interest in the information.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

That same day, September 30, Appellant submitted its third, and final, FOIA request ("Third Request"), stating: "To shed light on the manner in which the National Institutes of Health ("NIH") administers its statutory obligations under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, we respectfully request a copy of NIH's log of requests for records filed pursuant to the FOIA."  J.A. 35.

Although NIH denied expedited processing as to the First Request on August 4, 2021, it did not otherwise respond to any of the requests.  In November 2021, Appellant commenced the current litigation alleging that NIH failed to comply with the statutory deadlines and unlawfully withheld agency records in violation of FOIA.

Thereafter, on December 17, 2021, NIH issued what it called a Final Response.  This was the first time NIH provided a substantive response to any of Appellant's three FOIA requests, and it was in response to Appellant's Third Request.  In this response, NIH explained that the log of FOIA requests submitted to NIH was publicly available online. On December 23, 2021, NIH supplemented this Final Response and produced 130 pages of the "NIH FOIA Logs of Fiscal Year 2020 and 2021, with the Date Closed and Request Status columns" as requested by Appellant.  J.A. 42.  Appellant did not challenge the Third Request Final Response, or the supplementation, through the administrative appeals process of the NIH.

On February 7, 2022, NIH issued a Final Response to both the First and Second Requests.  The searches conducted by NIH for the First Request located 1,202 responsive documents.  Of these, NIH initially produced 238 pages of responsive records, which had redactions pursuant to FOIA exemptions five and six.  The searches conducted for the

Second Request located 794 pages of records and NIH initially released 17 pages of records, which had redactions, pursuant to FOIA exemptions five and six.

In response to the NIH Final Response as to the First and Second Requests, Appellant filed two separate administrative appeals to the NIH FOIA officer. In both appeals, Appellant claimed that the searches conducted by NIH were not reasonably calculated to identify all responsive records and that the FOIA exemptions were improperly applied relative to the redactions. NIH did not respond to either administrative appeal. NIH explained that it did not respond to the administrative appeals because the matters were already before the district court and "[e]xtending appeal rights on matters already before the court would not prove useful to either party in the case, since the outcome of any appeal would be superseded by the court's decision." J.A. 277.

On February 25, 2022, Appellant amended its complaint in the district court to account for the documents produced by NIH. The amended complaint, which is the operative complaint here, alleges three claims for relief. In Count One, Appellant asserts the "failure to comply with statutory deadlines in violation of FOIA" due to the NIH failing to respond to the initial FOIA requests. J.A. 19. In Count Two, Appellant asserts the "failure to conduct a search reasonably calculated to locate all responsive records." *Id.* at 20. As to Count Three, Appellant alleges the "unlawful withholding of non-exempt agency records" and challenges the redactions made by NIH. *Id.* at 21.

On March 16, 2022, the district court issued a Scheduling Order setting out relevant discovery deadlines. That same day, NIH moved to vacate the Scheduling Order, asserting that discovery in FOIA cases is rare and traditionally takes place after a motion for

summary judgment. On March 30, 2022, NIH filed the first of three declarations from its FOIA officer, which explained how NIH conducted the searches for documents responsive to Appellant's requests. On April 8, 2022, the district court granted the motion to vacate the Scheduling Order because NIH had already indicated it would be producing more responsive documents in the context of its summary judgment motion. Therefore, the district court ruled discovery was improper until after a ruling on summary judgment.

On May 13, 2022, NIH submitted an additional response to the First and Second Requests. In this response, NIH produced the remaining 964 pages in response to Appellant's First Request and the remaining 777 pages in response to the Second Request with redactions pursuant to exemptions five and six. On June 10, 2022, NIH filed the second declaration from its FOIA officer. This second declaration further explained the searches conducted in order to produce the additional records. On the same day, NIH filed for summary judgment, arguing that the searches it conducted were adequate and that the exemptions it applied were proper.

On August 12, 2022, the district court held the summary judgment motion in abeyance and ordered NIH to produce unredacted versions of the documents withheld pursuant to exemptions five and six for in camera review. The court also ordered NIH to file a third declaration specifying which of the 27 components of NIH were searched for the second production. On September 9, 2022, after reviewing the unredacted versions of the documents in camera, the district court granted NIH's motion for summary judgment as to Counts Two and Three, in part, but required NIH to remove redactions for some of the challenged documents and to produce further information with respect to the other

redactions. Specifically, as to the Second Request, the district court required NIH to remove a redaction it had made pursuant to exemption five of the dates that prior congressional responses were distributed. The court also required NIH to disclose the identity of a Wuhan University researcher and the NIH employee who processed the SRA curator requests of that researcher. The district court deemed all other redactions to be proper. On September 16, 2022, the district court granted summary judgment to NIH as to Count One of Appellant's complaint, required NIH to produce an exhibit listing prior communications between Congress and NIH without redactions, and granted the remainder of the summary judgment motion as to Counts Two and Three.

This timely appeal followed.

## II.

We review a district court's grant of summary judgment in a FOIA action de novo. *Rein v. U.S. PTO*, 553 F.3d 353, 358 (4th Cir. 2009). Determining "whether a document fits within one of FOIA's prescribed exemptions is also a matter of law, unless the legal conclusion is based upon factual findings, which we review for clear error." *Hunton & Williams v. DOJ*, 590 F.3d 272, 276 (4th Cir. 2010).

## III.

### A.

Appellant first claims that FOIA provides a standalone cause of action when an agency violates the statutorily imposed deadlines. Therefore, Appellant argues that summary judgment was improper as to Count One because NIH did not meet the FOIA

deadlines for production of the documents. This is at odds with our precedent and the plain text of FOIA.

FOIA was passed "to establish a general philosophy of full agency disclosure and assure the availability of Government information necessary to an informed electorate." *Coleman v. DEA*, 714 F.3d 816, 818 (4th Cir. 2013) (cleaned up) (internal citations omitted). FOIA provides that federal agencies must make their internal records available to the public upon request. 5 U.S.C. § 552(a)(3)(A). Upon receipt of a request, an agency has twenty working days "to determine . . . whether to comply with such request and shall immediately notify the person making such request of such determination." *Id.* § 552(a)(6)(A)(i)(I). If a requester disagrees with an agency's determination, the requester may file an administrative appeal. *Id.* § 522(a)(6)(A)(i)(III). In the typical case, a requester can file suit only after exhausting this administrative appeal process. *Coleman*, 714 F.3d at 823.

FOIA also provides that when an agency violates the twenty-day deadline for the agency to determine whether to comply with a request, the requester is deemed to have exhausted his administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i) ("Any person making a request to any agency . . . shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions."). This constructive administrative exhaustion, and resulting ability to begin litigation, is the exclusive remedy for the failure of an agency to respond in a timely manner.

We addressed the exclusivity of this administrative exhaustion remedy in *Coleman v. DEA*, 714 F.3d 816 (4th Cir. 2013). In that case, the Drug Enforcement Agency ("DEA") did not respond to a FOIA request for over sixteen months. Eventually, the DEA denied the request, claiming that the requester's pledged processing fee, which an agency can collect to offset the cost of searching if a request is for a commercial use, was insufficient. *Id.* at 821. The requester, Coleman, appealed this fee assessment to the Department of Justice's Office of Information Policy ("OIP"), which handles all FOIA administrative appeals from the DEA. Seven months later, OIP concluded that the fee assessment determination by the DEA was incorrect and remanded the request to the DEA. A month later, after receiving no response from the DEA following the remand, Coleman resubmitted his initial FOIA request to the DEA. After waiting another four months with no response from either the DEA or OIP regarding the remand or the resubmitted request, Coleman filed suit in federal court.

The district court dismissed the lawsuit, finding that Coleman failed to pay the necessary processing fee and exhaust his administrative remedies. Coleman appealed, asserting he was not required to pay the fee because the research was not for a commercial purpose, and that it was appropriate to begin litigation because of the non-response of both agencies.

We agreed with Coleman. We explained that Coleman had constructively exhausted his administrative remedies because, "if an agency does not respond to a request within twenty working days after receiving it, the requester may typically commence litigation." *Coleman*, 714 F.3d at 823 (citing *Citizens for Resp. & Ethics in Wash.*

("CREW") *v. FEC*, 711 F.3d 180, 182–83 (D.C. Cir. 2013)). We concluded that the DEA's failure to respond, "triggered constructive exhaustion of [the requestor's] administrative remedies and allowed [the requestor] to proceed directly to court." *Id.* at 823. Moreover, the DEA's response, after litigation had already begun, did not prevent constructive exhaustion, which applies "if an agency has exceeded its statutory deadline, unless the agency responds to the request *before suit is filed.*" *Id.* at 824 (emphasis in original) (quoting *Pollack v. DOJ*, 49 F.3d 115, 118 (4th Cir. 1995)).

Here, as in *Coleman*, there is no question that NIH failed to comply with the FOIA twenty-day time limit. And *Coleman* makes clear that this violation has already been redressed through constructive administrative exhaustion. Indeed, Appellant proceeded directly to court. Therefore, NIH cannot rely on the traditional administrative appellate process, and FOIA does not provide a separate cause of action. *See CREW*, 711 F.3d at 189 ("If the agency does not adhere to FOIA's explicit timelines, the 'penalty' is that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting into court."); *see also Roseberry-Andrews v. DHS*, 299 F. Supp. 3d 9, 20 (D.D.C. 2018) (holding "an agency's failure to comply with these statutory deadlines is not an independent basis for a claim"); *Landmark Legal Foundation v. EPA*, 272 F. Supp. 2d 59, 62 (D.D.C. 2003) ("[A] lack of timeliness does not preclude summary judgment for an agency in a FOIA case. The only question for summary judgment is whether the agency finally conducted a reasonable search, and whether its withholdings are justified. When exactly a reasonable search was conducted is irrelevant.").

While we have not addressed any exceptions to the exclusivity of this remedy, other circuits have allowed injunctive relief where a litigant alleges, and proves, that the agency in question has a "policy or practice" of violating FOIA's timelines. *See Judicial Watch v. DHS*, 895 F.3d 770, 781 (D.C Cir. 2018) ("A plaintiff states a plausible policy or practice claim by alleging prolonged, unexplained delays in producing non-exempt records that could signal the agency has a policy or practice of ignoring FOIA's requirements.") (cleaned up); *see also Lybarger v. Cardwell*, 577 F.2d 764, 767 (1st Cir. 1978) ("There may very well be circumstances in which prolonged delay in making information available or unacceptably onerous opportunities for viewing disclosed information require judicial intervention."); *Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1103 (9th Cir. 2016) ("[W]e have recognized a pattern or practice claim for unreasonable delay in responding to FOIA requests."). To prove this claim, a plaintiff must demonstrate "a pattern of prolonged delay amounting to a persistent failure to adhere to FOIA's requirements and that the pattern of delay will interfere with its right under FOIA to promptly obtain non-exempt records from the agency in the future." *Judicial Watch*, 895 F.3d at 781.

In *Judicial Watch*, the requestors sought information about travel spending for the president and his family from the Secret Service. 895 F.3d at 775. The Secret Service failed to respond to the requestor for thirteen months. The requestors in *Judicial Watch* also cited five prior lawsuits their organization brought against the Secret Service for the same noncompliance with deadlines. In each of those cases, and in the *Judicial Watch* litigation, the Secret Service produced the documents as soon as litigation was commenced

and then moved for dismissal on mootness grounds.  In their complaint, the requestors also alleged that they were planning to continue requesting information from the Secret Service. The court found that the Secret Service's repeated practice of using litigation to avoid requests, only producing documents once the requestor commenced suit, and then seeking dismissal required injunctive relief.  The district court also noted that this practice, "will impair the party's lawful access to information in the future."  *Id.* at 776 (quoting *Payne Enters., Inc. v. U.S.*, 837 F.2d 486, 491 (D.C. Cir. 1988)).

The Ninth Circuit was presented with a similar set of facts in *Long v. IRS*, 693 F.2d 907 (9th Cir. 1982).  The requestors in that case sought injunctive relief after a decade long litigation with the International Revenue Service ("IRS") over a FOIA request.  In that case, the IRS would delay releasing the requested documents until after a lawsuit was filed, at which point the IRS would immediately produce the requested documents.  The Ninth Circuit granted the requestors injunctive relief, finding that the prolonged delays, the purposeful past violations, and the indication that these delays would continue merited court intervention.  *Id.* at 910 ("When these factors [the possibility of recurrence and the character of past violations] are considered, it becomes clear that injunctive relief is appropriate in this case to prevent the prolonged delays and repeated litigation over disclosure of the same type of documents in the future.").

We have not had occasion to determine whether to recognize a policy or practice claim in this Circuit and this case does not present the proper vehicle to do so.  Here, Appellant failed to allege a policy or practice claim, and there is nothing in the facts of this case to indicate a willful and repeated violation of FOIA deadlines.  Although NIH did

13

miss three deadlines, those deadlines were all related to a single set of underlying facts. All three requests concerned the Bloom article and the removal of the SRA sequence. The First Request specifically asked for information about the Bloom article. The Second Request asked for communications with the senators who had themselves asked for information about the Bloom article. And the Third Request flowed from the failure of NIH to respond to the earlier two requests and asked for the NIH logs of responses to other requests received from March 2020 to 2021. Further demonstrating the relation between these requests, NIH responded to the First and Second Requests in a single response letter. This is a far cry from manipulating FOIA deadlines to ensure that requestors only receive responsive documents after a lawsuit is filed. While a policy or practice claim may merit injunctive relief for excessive and purposeful FOIA delays, there is nothing to indicate that necessity here. And, significantly, as noted, Appellant failed to allege anything of the sort.

## B.

### 1.

Appellant next contends that the NIH searches were inadequate because the explanations submitted by the NIH FOIA officer were conclusory and, therefore, insufficient.

When determining the adequacy of a search, "the relevant inquiry is not whether the Agencies' search uncovered every potentially responsive document, but whether the search was reasonably calculated to discover responsive documents." *Rein v. U.S. PTO*, 553 F.3d 353, 364 (4th Cir. 2009) (internal citation omitted). When demonstrating the adequacy of searches, "agencies may rely on an affidavit that is reasonably detailed, setting forth the

search terms and the type of search performed and avers that all files likely to contain responsive materials were searched." *Id.* at 362 (cleaned up) (quoting *Ethyl Corp. v. U.S. Env't Prot. Agency*, 25 F.3d 1241, 1246–47 (4th Cir. 1994)). However, an agency must provide more than conclusory statements that it has reviewed all relevant files. *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 370–71 (D.C. Cir.1980).

In this case, NIH FOIA Officer, Gorka Garcia-Malene ("Garcia-Malene"), submitted three declarations detailing the searches performed. Items one and two of the First Request sought "all communications regarding the request to post [and withdraw] the SARS-CoV-2 sequences to the Sequence Read Archive in March 2020." J.A. 26. Garcia-Malene explained that, in response, NIH searched the NCBI database used for tracking communications between NIH curators, who are employees tasked with maintaining the SRA, and submitters using the specific project identification NIH assigned to the withdrawn sequence. Garcia-Malene further explained that this database was searched because it housed all records relating to the SRA, SRA curators, and all submitted requests for withdrawal from the SRA.

Item three of the First Request sought all communications between NIH and Bloom, and all internal communications about the NIH press release after the Bloom article was published. In response, NIH asked the Acting Director of NCBI to search his email account for communications between NIH and Bloom. Garcia-Malene explained this email account would contain all communications between NIH and Bloom because of the director's involvement with the SRA. Garcia-Malene also explained that NIH searched this email within the date range Appellant requested and used the keywords: "preprint,"

15

"jesse bloom," or "biorxiv." J.A. 269. NIH explained that these key words were chosen because they would identify communications relating to the Bloom manuscript and article relative to COVID-19 SRA sequence. Per Garcia-Malene, NIH also conducted additional searches at Appellant's request. It searched the email accounts of the prior directors of the NIH, the Deputy Director of Extramural Research, and the prior director of OCPL.

Item four of Appellant's First Request sought all communications related to the press statement released by NIH about the withdrawn sequences. In response, NIH searched the records of the OCPL. Garcia-Malene explained this was the only sub-agency searched because Appellant specifically designated the NIH Press Office as a search location in its FOIA request and because the OCPL "serves as the agency's press office" it would contain any responsive press communications. J.A. 270. Garcia-Malene further explained that when conducting these searches NIH used the keywords "NIH statement sequence read archive." *Id.*

As to the Second Request, NIH searched the OD's Office of the Executive Secretariat ("OES") for any communications relating to Senators Grassley and Blackburn. Garcia-Malene explained that only the OES was searched because all Congressional correspondence is funneled through this office. He explained, "the NIH Director's Executive Secretariat houses all Congressional correspondence received by NIH in their . . . database system." J.A.274. Because of this database system, NIH did not need to search individual email accounts, since it was all contained in a single database. NIH also searched for responsive records in the OLPA because the OES works closely with the OLPA to ensure all congressional correspondence is appropriately handled and vetted.

These searches produced 794 pages of records which were all ultimately released to Appellant.

For the Third Request, Garcia-Malene explained that the log of FOIA requests submitted to NIH is publicly available on its website. Additionally, Appellant produced 130 pages of records in response to the Third Request with no redactions. Appellant does not challenge anything relating to the Third Request.

Based on this record, the district court was correct in concluding that NIH fulfilled its obligations pursuant to FOIA to perform a search "reasonably calculated to uncover all relevant documents." *Rein*, 553 F.3d at 362 (quoting *Ethyl Corp.*, 553 F.3d at 362). The declarations submitted by NIH are sufficiently detailed to explain where NIH searched, why those areas were searched, and the mechanisms of the search.

2.

Appellant further argues that the searches were inadequate because NIH did not explain the discrepancy between the initial and subsequent productions for the First and Second Requests. In response to the First Request, NIH discovered 1,202 responsive records. But initially, in February 2022, it produced only 238 pages of records. In May, NIH produced the remaining 964 pages. As to the Second Request, NIH identified 794 pages of records. Initially, in February 2022, it produced only 17 pages of records. Then, in May, NIH produced the remaining 777 pages of records. These supplemental productions in response to the First and Second Requests occurred after the district court held a hearing on the motion to vacate the Scheduling Order. At that hearing, the district

court informed the parties that the Scheduling Order was being vacated in order to allow NIH to continue document production.

Continuing production is a sign of an agency's compliance -- not of inadequacy. *See Landmark Legal Foundation*, 272 F. Supp. 2d at 63 ("[C]ontinuing discovery and release of documents does not prove that the original search was inadequate, but rather shows good faith on the part of the agency that it continues to search for responsive documents."). Further, Garcia-Malene explained the discrepancy between the first and second productions. He explained that the documents in the second production were only determined to be relevant after NIH reviewed the initial 238 pages of documents and cross-referenced those pages with the First Request. Further, Garcia-Malene explained that the documents came from different sub-offices which impacted the timeline of the review process and the subsequent release. He also explained that the second production in response to the Second Request was responsive to items mentioned in Appellant's administrative appeal and were released in response to that appeal.

Continuing production is to be rewarded, not punished, and NIH sufficiently explained the reasons for the additional document productions. The submitted declarations demonstrate that NIH conducted searches reasonably calculated to discover all responsive documents. *Rein*, 553 F.3d at 364. Therefore, Appellant's challenges to the searches conducted by NIH are without merit.

### C.

Finally, Appellant challenges the redactions NIH made to the documents it produced. These challenges are without merit. FOIA exempts certain categories of records

from disclosure.  5 U.S.C. § 552(b).  The two statutory exemptions relevant to this appeal are 5 U.S.C §§ 552(b)(5) and (6).

1.

FOIA exemption five exempts from disclosure

> inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested.

 5 U.S.C. § 552(b)(5).

This exemption "incorporates the privileges available to Government agencies in civil litigation, such as the deliberative process privilege."  *U.S. Fish & Wildlife Serv. v. Sierra Club*, 592 U.S. 261, 263 (2021).  In order for exemption five to apply, the document must be both pre-decisional and deliberative.  A document is pre-decisional if it was generated prior to the agency's final decision on the matter.  *Id.* at 266.  It is deliberative if it was prepared to help the agency formulate its position.  *Id.*  Therefore, "the [deliberative process] privilege . . . protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Ethyl Corp*, 25 F.3d at 1248 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  However, the privilege does not protect documents that are peripheral to policy deliberation.  *Id.*  The privilege also does not protect purely factual material unless it is so intertwined with pre-decisional, deliberative material that revelation of the factual material would expose the protected information.  *Solers, Inc. v. IRS*, 827 F.3d 323, 330 (4th Cir. 2016).

19

a.

Appellant challenges two redactions made by NIH pursuant to exemption five. First, Appellant challenges the redaction of a list of questions and responses that were prepared in response to a Chinese news article covering the Bloom publication. This listing of questions and responses was part of an email discussion among NIH employees. The employees were discussing how to respond to the article. Appellant claims that because the answers to the questions employees were asking about the NIH response to the article were factual, they do not fall within the ambit of exemption five. However, when evaluating whether material falls under exemption five, we must consider the administrative context of the creation of the material in question. *U.S. Fish & Wildlife*, 569 U.S. at 269. Here, the record, when read in that context, demonstrates that these responses were pre-decisional and deliberative.

First, the responses were exchanged between employees with requests for input. Attached to the email exchanges is an information sheet setting out the prior NIH responses to the media and providing draft answers as to how to respond to further questions. The redacted material is clearly a deliberation about potential responses to the Chinese news article, and how to best proceed in responding to questions. These questions did not demonstrate the final position of NIH. Moreover, while the potential responses may have contained factual information, the record demonstrates the factual information was so intertwined with the potential responses as to require simultaneous disclosure of the thinking of NIH about the article. Thus, this redaction is deliberative and pre-decisional as it demonstrates NIH preparing a response to the article before the final response was

produced. *See U.S. Fish & Wildlife*, 592 U.S. at 269 ("[A] document that leaves agency decisionmakers 'free to change their minds' does not reflect the agency's final decision" and is exempted from disclosure.). Therefore, it falls within the ambit of exemption five and was properly redacted.

b.

Next, Appellant challenges the NIH redaction of draft responses to the inquiry from Senators Blackburn and Grassley. Appellant argues that because these responses were ultimately released to the Senators, and contained factual information, the drafts are unprotected. That argument does not withstand scrutiny. The factual information was so intertwined with the deliberative process information so as to prevent disclosure of the facts without simultaneously disclosing the deliberation. The record indicates that NIH was engaged in intra-agency discussions as to how to respond to the Senators. The fact that the documents in question were drafts also indicates that the documents were pre-decisional and deliberative. While the label of "draft" is not dispositive, the fact that these responses were to be provided to Congressional officials and exchanged among various NIH employees with requests for feedback demonstrates the draft nature of these responses. *Compare U.S. Fish & Wildlife*, 592 U.S. at 269 ("[T]he administrative context confirms that the drafts are what they sound like: opinions that were subject to change."). Thus, they are properly covered by exemption five.

2.

FOIA exemption six exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of

personal privacy." 5 U.S.C. § 552(b)(6). To apply exemption six, a court must evaluate the specific redacted information and determine if that information advances the public interest. *See Solers*, 827 F.3d at 332 ("The public interest is served to the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.") (cleaned up) (internal citations omitted).

Pursuant to exemption six, NIH redacted the email address and phone number of the SRA curator, the identity of the NIH program analyst who worked with the curator, and the identity of the Wuhan University researcher who submitted the withdrawn sequence. Appellant challenges all three redactions, claiming this information is of public interest because American citizens have a right to know what their government knows about the origin of COVID-19. In response, NIH argues that the contact information and identity of these individuals is irrelevant to this claimed public interest and its dissemination would clearly constitute an unwarranted privacy invasion.

There are two steps to determining whether exemption six applies. First, we must determine whether the redacted information is the type of "similar file" shielded from disclosure. 5 U.S.C. § 552(b)(6). When making this determination, we are to apply a broad meaning to the word "file," considering "the term similar files, includes all files which contain information about a particular individual." *Core v. U.S. Postal Serv.*, 730 F.2d 946, 947 (4th Cir. 1984). Next, we must determine if releasing that information would constitute an unwarranted invasion of privacy interests. *See id.* ("If the files fall within this definition, the remaining issue is whether disclosure would constitute a clearly unwarranted

invasion of personal privacy."). To do this, we "employ a balancing test that weighs the individual's privacy interests against the public interest in disclosure." *Solers*, 827 F.3d at 332.

Exemption six has been applied to agency employees' identities and email addresses. *See Solers*, 827 F.3d at 332 (holding that exemption six applied to the names and contact information of the employees involved in the requestor's audit about which he sought responsive documents). Therefore, the redacted email addresses of NIH employees and the identity of the Wuhan University researcher clearly fall within the ambit of exemption six. Appellant does not dispute this. Instead, Appellant argues the contact information and identity of the NIH employees and the Wuhan University researcher goes to the public's interest in knowing what their government knows about the origin of the COVID-19 pandemic and that the public interest should prevail. We are not convinced.

First, knowing the NIH employees' contact information and identity has no bearing on the knowledge the American public has about the origin of the pandemic. The actions these employees took relating to the removed sequence *may* be relevant to that question. However, Appellant has not demonstrated how disclosing the identity and contact information of these individuals will promote the public's knowledge about the origin of the pandemic and we cannot discern any legitimate reason for disclosure of this information.

As to the identity of the Wuhan University researcher, Appellant presents a closer question. At oral argument, Appellant argued that the identity of this researcher was relevant to the ability of the public to access further research by this same researcher about

the origin of the COVID-19 pandemic.  Oral Argument at 11:56–12:18, *Empower Oversight Whistleblowers & Research v. NIH*, No. 23-1141 (4th Cir. Sept. 25, 2024), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.  But, this argument is too attenuated to demonstrate a sufficient public interest in access to the identity of the Wuhan University researcher.  Appellant argues that knowing the identity could lead an American citizen to learn of other papers which *may* be published by this same researcher that *may* be about the origin of the COVID-19 pandemic.  That attenuated possibility cannot outweigh the privacy interest of the researcher.

## IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment to NIH.

*AFFIRMED*